UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMANDA CORTEZ, ) | |
| ) | |
| *Plaintiff*, ) | Case No. 1:24-cv-04384 |
| ) | |
| v. ) | Judge Sharon Johnson Coleman |
| ) | |
| I.Q. DATA INTERNATIONAL, INC., ) | |
| ) | |
| *Defendant*. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Amanda Cortez brings an amended complaint against Defendant I.Q. Data International, Inc., ("IQ Data") alleging violations of the federal Fair Debt Collection Practices Act ("FDCPA") and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), arising from IQ Data's attempt to collect a debt Plaintiff owed to her former landlord. Before the Court is IQ Data's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). For the following reasons, the Court grants IQ Data's motion.

**Background**

This case centers on an alleged debt Plaintiff owed for unpaid rent on her former apartment that she co-leased with her ex-boyfriend and calls made by IQ Data to Plaintiff and her father over a span of several months to collect this debt. As is common in such disputes, both parties present different accounts of the other's conduct during this period. Helpful to the Court's analysis, to support its motion, IQ Data attaches transcripts of the phone calls between its representatives, Plaintiff, and Plaintiff's father during this time.[1] *See* Dkt. 24, Ex. A. As such, the Court references both Plaintiff's complaint and these phone transcripts in establishing the facts of the case.

---

[1] Under the incorporation-by-reference doctrine, if a plaintiff mentions a document in her complaint, the defendant may submit that document to the court without converting the defendant's 12(b)(6) motion to a motion for summary

As she brought the case, the Court begins with Plaintiff's description of the events as described in her amended complaint. (Dkt. 19.) On April 2, 2024, a representative from IQ Data called Plaintiff on behalf of a property manager to collect an unpaid rent balance. Due to abuse she had suffered from her ex-boyfriend, Plaintiff had moved out of her former apartment prior to the end of the lease, leaving a balance for unpaid rent and associated fees. Plaintiff, who was at a charity event when the representative called, was not sure what the debt was for and explained that she could not discuss the account further as she needed to go into a meeting. The representative admonished her for being "unprofessional" for taking a call while in a meeting.

Once Plaintiff was available again, she called IQ Data back to get more information regarding the alleged debt, this time speaking with a different representative. During the call, Plaintiff asked for a bill or itemization of the debt so that she could understand what it was for, as she had not received any notice of the debt prior to speaking with IQ Data that day. Shortly thereafter, her father, Ed Cortez, picked her up from the charity event. Plaintiff states that she was "distraught" from the interaction with IQ Data and gave her father permission to contact IQ Data to inquire about the debt. IQ Data then made multiple "harassing, abusive, and misleading" telephone calls to her father, during which they refused to provide an itemized statement of the debt without preconditions, suggested that failing to pay the debt would result in negative credit reporting, and suggesting that the only way to prevent a negative credit report was to pay the amount in a lump sum. Plaintiff also alleges that she never received verification of the debt nor any notice as required by the FDCPA.

The telephone transcripts by IQ Data tell a different story. On April 2, IQ Data and Plaintiff had three telephone conversations. (Dkt. 24, Ex. A.) The first time, IQ Data called, but the call went

---

judgment. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). "When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013); *see also id* (explaining that "[w]hen an exhibit contradicts the allegations in the complaint, ruling against the non-moving party on a motion to dismiss is consistent with [the court's] obligation to review all facts in the light most favorable to the non-moving party").

to voicemail. The second time, IQ Data called, and Plaintiff answered. After the representative told Plaintiff that he was calling on behalf of IQ Data regarding a debt, Plaintiff responded that she was in a meeting. The representative then said "You picked up your phone during a work meeting? That is unprofessional." The call ended after that statement.

The third time, Plaintiff called IQ Data back and reached a different representative. On that call, Plaintiff complained that the prior representative was "disrespectful," exclaiming that "[h]e was such an asshole" and that she "would love to tell him that I am willing to pay whatever the fuck I have to pay in full." (*Id.*) After Plaintiff voiced her frustrations and stated that she would be "very polite" with the representative, the representative informed her that IQ Data was trying to resolve the balance owed on her apartment. (*Id.*)

During this call, Plaintiff repeatedly stated that she had no problem paying the balance and that IQ Data could either email the relevant information or mail it to her address. (*Id.*) When asked whether she had any financial issues paying the debt, Plaintiff responded "[n]o, I am able to pay" and that the delay in payment "was not a financial issue" but rather due to an abusive situation with her ex-boyfriend, with whom she had lived with at the apartment. (*Id.*) After once again vociferously complaining about the previous representative, Plaintiff stated she "was willing to pay whatever I have to pay" but wanted to the debt itemized so that she could split the amount with her ex-boyfriend. (*Id.*)

Continuing the call, the representative explained that while she could elect to pay 50% of the debt, because the debt was jointly owed, if her ex-boyfriend failed to pay his portion, she could still face a credit report or further collection action. (*Id.*) Plaintiff voiced her understanding, stating that she would call back later in the week to pay the 50% after talking with an attorney. (*Id.*) Plaintiff further stated that she would "risk [her] credit, and it will be okay eventually," that she would take her chances "with bad credit in the future," and that she understood that interest may continue to accrue on the account while the debt remained unpaid. (*Id.*) Plaintiff ended the call by thanking the female

representative, once again voicing her displeasure with the previous representative, and apologizing "for being difficult" on the call. (*Id.*)

The telephone transcripts provide all the detail of the calls between Plaintiff's father—Mr. Cortez—and IQ Data after he picked her up from the charity event. On April 4, Mr. Cortez called IQ Data and asked for information about the debt, explaining that he "never received an invoice [or] notice" of the debt. The representative informed Mr. Cortez that he could only share information with authorized third parties, to which Mr. Cortez replied that he would have Plaintiff call IQ Data to provide that authorization. (*Id.*) Plaintiff called IQ Data shortly after and authorized Mr. Cortez to speak with IQ Data on her behalf. (*Id.*)

As far as the record is concerned, that is the last phone call Plaintiff had with IQ Data. Between April 4 and June 10, Mr. Cortez had several phone calls with IQ Data to try and payoff the balance of the debt. The record of these calls ends on June 10, when Mr. Cortez called IQ Data to make a payment towards the balance according to an installment plan he had agreed to with IQ Data.

The telephone transcripts provide extensive details about when and how IQ Data shared information about the alleged debt with Mr. Cortez and open a window into IQ Data's conduct on these calls. But this case is about Plaintiff in her experiences with IQ Data, not her father's. On May 29, 2024, Plaintiff and Mr. Cortez filed a complaint against IQ Data before this Court, to which IQ Data filed a motion to dismiss on July 30, 2024. Plaintiff then filed the operative amended complaint on September 3, 2024, terminating Mr. Cortez as a plaintiff. (Dkt. 18.)

Plaintiff brings six counts against IQ Data in her amended complaint. The first five allegations claim that IQ Data violated the FDCPA by: failing to send notice to Plaintiff within five days of IQ Data's initial communication with Plaintiff as required by 15 U.S.C. § 1692g (Count 1); engaging in conduct that was meant to "harass, oppress, or abuse" Plaintiff in violation of 15 U.S.C. § 1692d (Count 2); having policies and procedures the "natural consequence" of which are to harass, oppress,

or abuse consumers in violation of 15 U.S.C. § 1692d (Count 3); using false, deceptive, or misleading representations or means in connection with the collection of a debt in violation of 15 U.S.C. § 1692e (Count 4); and using unfair or unconscionable means to collect a debt in violation of 15 U.S.C. § 1692f (Count 5). The remaining count alleges that IQ Data engaged in unfair and deceptive practices in its effort to collect the debt from Plaintiff in violation of ICFA, 815 ILCS 505/1 *et seq* (Count 6).

On September 17, IQ Data filed the present motion to dismiss. (Dkt. 22.) The Court now turns to IQ Data's motion.

**Legal Standard**

A Rule 12(b)(1) motion asserts that the federal district court lacks subject-matter jurisdiction over the claim, including that the adverse party lacks Article III standing to bring their claim. Fed. R. Civ. P. 12(b)(1). The party invoking federal jurisdiction bears the burden of establishing the elements necessary to show that the party has Article III standing. *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1244 (7th Cir. 2021). "If the plaintiff lacks standing, the federal court lacks subject matter jurisdiction and the suit must be dismissed." *Int'l Union of Operating Eng'rs Loc. 139, AFL-CIO v. Daley*, 983 F.3d 287, 294 (7th Cir. 2020). A standing challenge "can take the form of a facial or a factual attack on the plaintiffs' allegations." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007 (7th Cir. 2021). A facial attack "tests whether the allegations, taken as true, support an inference that the elements of standing exist." *Id.* When a defendant has facially attacked standing at the pleading stage, the Court accepts all well-pleaded factual allegations as true and construes all reasonable inferences in the plaintiff's favor. *Id.*

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim tests the sufficiency of the complaint, not its merits. *Skinner v. Switzer*, 562 U.S. 521, 529, 131 S. Ct. 1289, 1295, 179 L. Ed. 2d 233 (2011). To survive a motion to dismiss, a plaintiff must "state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929

(2007). A complaint is facially plausible when the plaintiff alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). When considering dismissal of a complaint, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 167 L. Ed. 2d 1081 (2007) (per curiam). While a plaintiff need not plead "detailed factual allegations" to survive a motion to dismiss, she still must provide more than mere "labels and conclusions or a formulaic recitation of the elements of a cause of action" for her complaint to be considered adequate. *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678).

**Discussion**

Before addressing Plaintiff's FDCPA claims, the Court notes that Plaintiff did not respond to IQ Data's argument in its motion to dismiss that she has not sufficiently alleged to have suffered actual damages to sustain a claim under ICFA. Accordingly, Plaintiff's ICFA claim is dismissed for failure to state a claim.

Plaintiff's five counts under the FDCPA are similarly dismissed, and all for the same reason: Plaintiff lacks Article III standing to establish her claims. For a plaintiff to establish standing under Article III, the plaintiff must show that (1) she suffered a concrete and particularized injury-in-fact (2) that is traceable to the defendant's conduct and (3) can be redressable by judicial relief. *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 937 (7th Cir. 2022) (citing *Lujan v. Defs. Of Wildlife*, 504 U.S. 560-61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992). Plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431, 131 S. Ct. 2190, 2208, 210, L. Ed. 2d 568 (2021).

Plaintiff's claims falter at the first element: the lack of a concrete injury in fact resulting from IQ Data's conduct. A concrete injury is one that is "real, and not abstract." *Spokeo, Inc. v. Robins*, 578

U.S. 330, 340, 136 S. Ct. 1540, 1548, 194 L. Ed. 2d 635 (2016) (quotation marks omitted). Qualifying injuries are those with "a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Pierre*, 29 F.4th at 938 (quoting *TransUnion*, 594 U.S. at 424) (internal quotations omitted). This standard includes "traditional tangible harms, such as physical harms and monetary harms," as well as "[v]arious intangible harms," such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* (quoting *TransUnion*, 594 U.S. at 425). A plaintiff seeking money damages has standing to sue in federal court only for harms that have in fact materialized. *Id.* (quoting *TransUnion*, 594 U.S. at 434–38).

Here, there are four phone calls to examine for concrete injury: the call that went to voicemail on April 2, the brief call with the "disrespectful" IQ Data representative, the more substantive call with the second representative, and the call she made to IQ Data on April 4 authorizing her father to speak on her behalf regarding the debt. Plaintiff alleges that she was "distraught" after her April 2 calls with IQ Data, and that she suffered "emotional distress, time lost, and potential negative impact on creditworthiness" because of IQ Data's conduct. (Dkt. 18.) She also alleges that IQ Data failed to provide the statutorily required notice within the required timeframe. (*Id.*)

But as the Seventh Circuit has made clear, none of these alleged injuries are concrete to sustain an FDCPA claim. "Psychological states induced" by a debt collector's conduct "fall short" of the concreteness requirement," *Pierre*, 29 F.4th at 939, as do "worry" and "emotional distress" arising from concern about the debt or "confusion" as to one's legal liability regarding the debt. *Id.*; *see also Pucillo v. Nat'l Credit Sys., Inc.*, 66 F.4th 634, 639 (7th Cir. 2023) ("[T]he plaintiff must show a harm beyond emotional response, such as an adverse credit rating or detrimental action that the plaintiff took in reliance on the [debt collection] letters."). Similarly, a statutory violation, absent a resulting detrimental action, does not create a concrete injury for a court to remedy. *Id.* (explaining that "[s]tatutory violation or not," because there was no concrete harm from the debt collector's admonishing letters,

plaintiff's allegations that the debt collector's conduct was "deceptive and unconscionable in violation of the FDCPA" were not sufficient to establish standing). Finally, as to the "potential negative impact" on Plaintiff's credit, a risk of harm qualifies as a concrete injury only for claims for "forward-looking, injunctive relief to prevent the harm from occurring," not for monetary damages. *TransUnion*, 594 U.S. at 435.

In sum, though she may have been "distraught" from those early phone calls with IQ Data, Plaintiff does not allege that she experienced a concrete injury—such as an adverse crediting rating or some detrimental action she took in reliance of IQ Data's collection efforts—necessary to give her standing to pursue claims for money damages in federal court. Accordingly, the Court grants IQ Data's motion to dismiss and dismisses Counts 1–5 of Plaintiff's amended complaint.

**Conclusion**

For these reasons, the Court grants Defendant's motion and dismisses all counts of Plaintiff's amended complaint [22].

**IT IS SO ORDERED.**

Date: 3/31/2025

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge